## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**MICHELLE RENEE LAMB,**

    **Plaintiff,**

    **v.**                           **CASE NO.  23-3239-JWL**

**LAURA KELLY, et al.,**

    **Defendants.**

### MEMORANDUM AND ORDER

Plaintiff brings this pro se civil rights action under 42 U.S.C. § 1983.  Plaintiff is incarcerated at the Topeka Correctional Facility in Topeka, Kansas ("TCF").  Plaintiff has paid the filing fee.  On December 12, 2023, the Court entered a Memorandum and Order (Doc. 13) ("M&O"), screening Plaintiff's Amended Complaint and finding that the proper processing of Plaintiff's claims could not be achieved without additional information from appropriate KDOC officials.  *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978); *see also Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991).   Accordingly, the Court ordered the Kansas Department of Corrections ("KDOC") officials to prepare and file a *Martinez* Report.

The Court also found that Plaintiff's claims against Governor Kelly and John and/or Jane Does 1–10 were subject to dismissal and ordered Plaintiff to show good cause why these claims should not be dismissed.  Plaintiff responded, and on January 10, 2024, the Court entered a Memorandum and Order (Doc. 18) dismissing Plaintiff's claims against Governor Kelly and John and/or Jane Does 1–10.  The Court also found that Plaintiff's claim seeking to have her disciplinary record expunged must be brought as a petition for habeas corpus under 28 U.S.C. § 2241.

The M&O provided that "[o]nce the Report has been received, the Court can properly screen Plaintiff's claims under 28 U.S.C. § 1915A." (Doc. 13, at 11.) The *Martinez* Report (Doc. 19) (the "Report") has now been filed. The Court's screening standards are set forth in the Court's M&O.

## I. Nature of the Matter before the Court

Plaintiff, a transgender female, alleges in her Amended Complaint that Defendants are discriminating against Plaintiff by keeping her in restricted housing based on an unfounded and groundless allegation. (Doc. 12, at 2.) Plaintiff alleges that Defendant Megan Davis, then classifications administrator at TCF, wrote a letter based on false information, that was approved by Defendant Warden David McCabe. *Id*. at 5. Plaintiff references the letter she attached to her original complaint. *See* Doc. 1–1, at 2. It is the February 16, 2023 letter from Meghan Davis to Deputy Warden McCabe referring Plaintiff for Administrative Restricting Housing, Other Security Risk, "due to the elements of her criminal offenses and the risk to the population . . . [f]urther, the resident was not wholly forthcoming during her RDU evaluation." *Id*.

Plaintiff received a Disciplinary Report that provides:

> A review of the overhead cameras, found at 8:19 a.m. on 10/10/23, Resident Lamb was out in the restrictive yard area and being escorted back to Pod 4, through door 4, 107, and Resident Adams #107534 who was out on yard, approach each other give each other a hug that continues through another squeeze—appearing to be a "double hug". Resident Lamb is managed as a sex offender and this is against both the KDOC rule book and IMPP referenced above.

(Doc. 12–1) (citing 44-12-315a Lewd Act (Class I) Ref: IMPP 11-115). Plaintiff alleges that her hug should not be interpreted as a lewd act, it was not sexual in nature, and that "this rule is almost never enforced . . . [w]omen 'hug' everyday without getting a DR." (Doc. 12, at 9.) Plaintiff alleges that this was targeted discrimination. *Id*.

2

Plaintiff also alleges that K.A.R. 44-12-315(a) is being illegally interpreted and that managing her as a sex offender, when she has not been convicted of a sex offense, constitutes an illegal ex post facto application of the Sex Offender Registration Act.  (Doc. 12, at 5–9.)

Plaintiff alleges that she is being denied the privileges and incentives afforded to inmates in general population at TCF.  She alleges that this constitutes an atypical and significant hardship in violation of her due process rights.  Plaintiff seeks to be transferred to general population. *Id*. at 10.

The remaining defendants are: David McCabe, TCF Warden; Megan Davis, Retired Classifications Administrator at TCF; and Dalton Hartpence, Classifications Administrator at TCF.  In addition to seeking transfer to general population, Plaintiff also seeks: the appointment of a master to review the treatment of transgender women at TCF;  an abolishment of long-term restrictive housing and Other Security Status at TCF and a finding that they violate the Eighth Amendment; declaratory relief; an order directing TCF to discontinue managing Plaintiff as a sex offender; a finding that K.A.R. 44-12-315(a) must be revoked and replaced with language that correctly interprets the law; order that Plaintiff's Disciplinary Report be expunged; and order TCF to grant Plaintiff and Resident Adams' request to be roommates.  *Id*. at 10–13.

## II.  The Report

The Report provides that "Plaintiff has been incarcerated with KDOC since June 16, 1970, for the following convictions: Murder in the first degree; two counts of aggravated kidnapping; robbery; and two counts of aggravated escape from custody."  (Doc. 21, at 1; Doc. 21–1.)  The Report further provides that:[1]

---

[1] The Exhibits to the Report are located at the following docket entries:  Exhibit 1 is at Doc. 21–1; Exhibit 2 is at Doc. 21–2; Exhibit 3 is under seal at Doc. 22; Exhibit 4 is at Doc. 21–3; Exhibit 5 is at Doc. 21–4; Exhibit 6 is at Doc. 21–5; Exhibit 7 is at Doc. 21–6; Exhibit 8 is at Doc. 21–7; Exhibit 9 is at Doc. 21–8; Exhibit 10 is at Doc. 21–9; Exhibit 11 is at Doc. 21–10; Exhibit 12 was filed conventionally; Exhibit 13 is at Doc. 21–11; Exhibit 14 is at

A. **Placement in Restrictive Housing**

On January 25, 2023, Plaintiff underwent gender-affirming surgery at the University of Kansas Health System, where she remained in recovery until her transfer to TCF's infirmary on January 27, 2023.

Gloria Geither was the Warden of TCF from October 2019 to February 2023. Warden Geither expected Plaintiff to be housed in general population following Plaintiff's discharge from TCF's infirmary and completion of her intake evaluation. (Exhibit 2, p. 1). Intake evaluations, also known as Reception and Diagnostic Unit ("RDU") evaluations, establish a resident's psychological health upon their arrival at a KDOC facility.

Michelle Calvin, a behavioral health expert employed by Centurion of Kansas, LLC ("Centurion"), administered Plaintiff's RDU evaluation from TCF's infirmary.[2] The evaluation was completed on February 9, 2023. Ms. Calvin states on the first page of the evaluation that Plaintiff declined to answer questions relating to her crimes and convictions. (Exhibit 3, p. 2).

On February 16, 2023, Plaintiff was medically cleared to leave the infirmary. The same day, TCF Classifications Administrator Meghan Davis sent a letter to Deputy Warden David McCabe, her supervisor, seeking approval to classify Plaintiff as an Other Security Risk ("OSR"). The letter cites the nature of Plaintiff's criminal offenses, potential risk to the resident population, and Plaintiff's refusal to complete her RDU evaluation as qualifying factors of an OSR. (Exhibit 4).

OSR is a classification category under KDOC's Internal Management Policy and Procedure ("IMPP") 20-104A, which allows a warden to place a resident in restrictive housing if the resident has engaged in behavior that threatens the security of the facility. (Exhibit 5, p. 1 & 2). The purpose of OSR is to provide individualized planning and services to aid with integrating a resident into general population.

Deputy Warden McCabe forwarded the request to Warden Geither, who found Plaintiff's refusal to answer questions about her convictions worrying. Because Plaintiff's most serious crimes are violent actions specifically against women, and because this would be the first time in 50 years that Plaintiff would be cohabitating with women, Plaintiff's refusal to answer was a red flag. (Exhibit 2, p. 2).

Additionally, since intake evaluations help determine a resident's risk of harming themselves or others, Warden Geither

Doc. 21–12; Exhibit 15 is at Doc. 21–13; Exhibit 16 is at Doc. 21–14; Exhibit 17 is at Doc. 21–15; Exhibit 18 is at Doc. 21–16; Exhibit 19 is at Doc. 21–17; Exhibit 20 is at Doc. 21–18; and Exhibit 21 is at Doc. 21–19.
[2] Centurion of Kansas, LLC is KDOC's medical contractor for resident medical care.

concluded that OSR was an appropriate precautionary measure to assess Plaintiff's behavior prior to her placement in general population. (Exhibit 2, p. 2). Warden Geither approved Plaintiff as an OSR on February 16, 2023.

To ensure Plaintiff would not be in restrictive housing longer than necessary, a step-down approach was implemented to work towards integrating Plaintiff into general population. There are three aspects to the approach. (Exhibit 2, p. 2).

First, Plaintiff receives daily behavioral health support and services from Centurion therapists. Second, Plaintiff is granted incremental exceptions to her restrictive housing limitations to observe her behavior under conditions increasingly similar to those in general population. Third, a Multi-Disciplinary Team ("MDT") reviews Plaintiff's daily behavior reports and staff commentary regarding her interactions with others once monthly. (Exhibit 2, p. 2).

The MDT makes recommendations for adding or maintaining exceptions to Plaintiff's restrictive housing conditions and considers whether Plaintiff's OSR status should be ended, leading to her placement in general population. The recommendations are then considered by TCF's Restrictive Housing Review Board and warden, who make final determinations.[3]

The MDT is composed of the Plaintiff's Unit Team Manager, the TCF Classifications Administrator, the TCF Warden, the KDOC Classifications Administrator, the KDOC PREA Coordinator, the KDOC Deputy Secretary of Facility Management, and three medical representatives from Centurion including the KDOC Director of Behavioral Health. (Exhibit 2, p. 3).

Plaintiff has been allowed multiple exceptions to certain rules of restrictive housing through MDT recommendations. Plaintiff has never been restrained when exiting her cell, an otherwise required aspect of her OSR status. Plaintiff has been approved for dayroom time and has had it lengthened to 1.5 hours in the morning and 1.5 hours in the evening. She has been allowed to run outside for 1 hour every morning, at her request, along with special shower times to accommodate her runs. Plaintiff has been approved for a job, at her request, as a pod porter in which she cleans the pod and shower. Plaintiff has also received overrides to purchase items not typically allowed in restrictive housing, such as makeup and earrings. (Exhibit 6, p. 4).

Despite Plaintiff's exceptions to many aspects of restrictive housing, the MDT has consistently recommended against ending

---

[3]  All residents in restrictive housing, including Plaintiff, are afforded monthly in-person hearings before a Restrictive Housing Review Board. Residents may bring grievances, requests, and petition to be removed from restrictive housing.

her OSR status. Members of the MDT describe Plaintiff's behavior as predatory towards another resident and manipulative towards security staff. These behaviors have led to Plaintiff's refusal to follow facility rules and orders. (Exhibit 7, p. 2). The following are examples of Plaintiff's conduct assessed by the MDT.

On February 14, 2023, Plaintiff was escorted to a post-surgery medical evaluation. When Plaintiff was alone with one of her escorts, COII Hannah Ayala, Plaintiff repeatedly asked if her vagina looked good and natural. COII Ayala warned Plaintiff that such comments are inappropriate. On July 18, 2023, Plaintiff made several inappropriate comments to her escorting officer, COII Madeline Bigham, regarding her anatomy and sexual habits. (Exhibit 8). The repeated behavior was considered in MDT meetings and prompted Major Dona Hook to issue a standing order that Plaintiff must always [be] escorted by two female officers. (Exhibit 7, p. 2).

In July of 2023, Plaintiff sent three letters to the TCF Reentry Coordinator, Angela Golightley, the supervisor for Plaintiff's Unit Team Manager ("UTM"), Linda Hull-Viera. (Exhibit 9).

The first letter states that unless Plaintiff is placed in general population, her OSR status removed from her file, and Plaintiff receives support for parole, she will file a PREA complaint, a 42 USC Section 1983 lawsuit, and provide reporter Blaise Mesa with unspecified information. Plaintiff further alleges the reporter had agreed to make Ms. Golightley look bad publicly. (Exhibit 9, p. 1 & 2). The letters are attempts to manipulate Ms. Golightely into providing preferential treatment for Plaintiff.

The two following letters express how Plaintiff's lawsuits and communications with the reporter are progressing and, if Ms. Golightley yields to her demands, 'it will all go away.' (Exhibit 9, p. 3). Members of the MDT found these letters to be evidence of Plaintiff engaging in coercive behavior towards staff. (Exhibit 2, p. 3).

On July 2, 2023, Brittny Adams submitted an Inmate Request to Staff form asking if her and Plaintiff could be moved to a non-restrictive housing cell, Pod 1B, as cellmates. (Exhibit 10, p. 2). The facility responded that she could not, due to Plaintiff's OSR status. On August 2, 2023, Plaintiff submitted a request to staff form in which she copied Adams' request, and stated she would like to settle a lawsuit she has prepared in exchange for moving her and Adams to Pod 1B as cellmates. (Exhibit 10, p. 1).

A few days after filing the request, Plaintiff submitted a settlement offer to TCF staff. (Exhibit 11). Plaintiff listed three conditions for not filing a lawsuit that was attached to the offer. First, Plaintiff demanded that her OSR status be terminated.

Second, that her and Adams be moved to general population as cellmates. Third, that reporter Blaise Mesa be given documents and access to her for a story. (Exhibit 11, p. 2). Members of the MDT considered these requests and the settlement offer as additional examples of targeted, manipulative behavior by Plaintiff.

The relationship between Plaintiff and Adams has led both to repeatedly break restrictive housing no-contact rules and orders. Plaintiff and Adams have applied makeup and primming each other's eyebrows in the day room. (Exhibit 6, p. 2). On October 5, 2023, Plaintiff was sitting at a table with Adams in the restrictive housing day room. Adams is seen slipping off her sandal and caressing her foot against Plaintiff's foot. (Exhibit 12).[4] To prevent further contact, Major Dona Hook had Adams transferred to another cellblock.

Initially, staff attempted to provide Plaintiff with opportunities to correct her behavior before taking disciplinary action. (Exhibit 6, p. 2). Over time, Plaintiff became more emboldened to ignore the no-contact orders. (Exhibit 6, p. 2 & 4).

On October 10, 2023, Plaintiff and Adams were separately charged with a lewd act after hugging in front of Plaintiff's escorting officers and other residents.[5] (Exhibit 13, p. 1). Both plead guilty. Plaintiff has since received two additional disciplinary reports for hugging other residents. (Exhibit 13, p. 8 & 16). Plaintiff's continued violations of the no-contact rule demonstrate a pattern of non-compliant behavior.

Named defendants Dona Hook, Dalton Hartpence, and T.R. Shoulders[6] did not have any direct involvement in the initial decision to place Plaintiff in restrictive housing as an OSR. (Exhibit 7, p. 1; Exhibit 14, p. 1; Exhibit 15, p.1). Defendant David McCabe's sole involvement was forwarding the letter requesting OSR status from Meghan Davis to Warden Gloria Geither. (Exhibit 16, p. 1).

## B. Management as a Sex Offender

In early 2002, Plaintiff was first designated to be managed as a sex offender by the former Warden of El Dorado Correctional Facility ("EDCF"), Louis Bruce. IMPP 11-115 permitted residents convicted of a sexually motivated crime, but not necessarily a sex crime, to be managed as sex offenders. (Exhibit 17, p. 2). IMPP 11-115 established a Sex Offender Review Panel

---

[4] The Court has reviewed the video of the incident in Exhibit 12. The video depicts the incident as described in the Report.

[5] Plaintiff's relevant disciplinary record is discussed in greater detail in a later subsection of this report.

[6] The Court notes that Dona Hook and T.R. Shoulders are not named as defendants in this case.

("Panel") at each KDOC facility, which reviewed the management of residents as sex offenders and provided recommendations supporting or rejecting the status. On September 16, 2002, EDCF's Panel approved of Plaintiff's management as a sex offender. (Exhibit 18).

On March 12, 2004, Plaintiff filed a *habeas corpus* petition in the District Court of Butler County seeking to have her management as a sex offender terminated. (Exhibit 19). The Court summarily dismissed the petition in its entirety on April 29, 2009. (Exhibit 20).

Plaintiff's RDU evaluation from February 9, 2023, states that a review of all available documentation indicated Plaintiff engaged in inappropriate sexual behavior with one of her victims. The evaluation assigned Plaintiff a Sexually Motivated Indicator status. (Exhibit 3, p. 1). KDOC maintains that Plaintiff's change in gender does not affect her management status, and that her continued management as a sex offender is appropriate.

No named defendant had any direct involvement or engagement in the decision to manage Plaintiff as a sex offender. The determination was made by KDOC's former Sexual Offender Specialist, Kimberley Coffin, based on Plaintiff's management prior to her surgery. (Exhibit 21, p. 2).

## C. Disciplinary Report for a Lewd Act

At 8:19 a.m. on October 10, 2023, Plaintiff was being escorted through the TCF restrictive yard area to her cell by two officers, COII Dorie Johnson and COI Jennifer Combes. As Plaintiff was walking across the yard to the cellhouse entrance, Adams opened the cellhouse door from within, exited, and began walking towards the Plaintiff. Upon meeting, they embraced in a hug with two squeezes. (Exhibit 6, p. 3; Exhibit 13, p. 1).

Defendant Linda Hull-Viera has been Plaintiff's UTM since June 26, 2023. (Exhibit 6, p. 1). UTM Hull-Viera was Plaintiff's Unit Team Manager during the incident and was notified of the contact between Lamb and Adams. UTM Hull-Viera reviewed security camera footage of the restrictive yard area and saw the interaction from start to finish between Plaintiff and Adams. (Exhibit 6, p. 3). The footage was also seen by members of Plaintiff's MDT.

On October 10, 2023, UTM Hull-Viera charged Plaintiff and Adams, separately, for a lewd act. On October 12, 2023, Plaintiff was given notice of summons for a disciplinary hearing to be held on October 19, 2023. (Exhibit 13, p. 2).

On October 13, 2023, TCF's Disciplinary Administrator, Linda Gibson, met with Plaintiff to record her plea. Plaintiff plead

guilty to performing a lewd act and acknowledged waiver of her right to a future appeal regarding her guilt, as established under KDOC's Kansas Administrative Regulation ("KAR") 44-13-703(d). (Exhibit 13, p. 3 & 7). Adams also plead guilty.

Under KAR 44-13-703(d), a resident that pleads guilty may not later appeal the finding of guilt but may, within 15 days of the hearing, appeal the penalty imposed. As neither Plaintiff nor Adams appealed their penalties, retaining the security footage was not deemed necessary.[7]

Residents in restrictive housing operate under different rules than those in general population. Physical contact, including hugging, is not allowed due to the heightened security setting. (Exhibit 7, p. 2). UTM Hull-Viera has filed eight disciplinary actions for failing to maintain the no-contact environment in restrictive housing since she began supervising the unit. (Exhibit 6, p. 3). Plaintiff was not the first to be reprimanded for hugging a fellow resident, nor was she charged without prior warnings. (Exhibit 6, p. 3*).*

Named defendants Dona Hook, Dalton Hartpence, T.R. Shoulders, David McCabe, and Meghan Davis did not have any direct involvement in the disciplinary actions against Plaintiff. (Exhibit 7, p. 1; Exhibit 14, p. 2; Exhibit 15, p.1; Exhibit 16, p. 2; and Exhibit 21, p. 2).

(Doc. 21, at 2–10.)

## III. DISCUSSION

### A. Due Process

Plaintiff alleges that her placement in restrictive housing constitutes an atypical and significant hardship. Liberty interests which are protected by the Due Process Clause are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (internal citations omitted). Plaintiff does not have a constitutional right to a particular security classification or to

---

[7]  Security footage is not saved because TCF does not have the storage capacity to retain data for all disciplinary actions or claims indefinitely. Security footage is automatically overwritten every 14 days.

be housed in a particular yard. *Meachum v. Fano*, 427 U.S. 215, 224 (1976); *Harbin-Bey v. Rutter*, 420 F.3d 571, 577 (6th Cir. 2005) (increase in security classification does not constitute an atypical and significant hardship because "a prisoner has no constitutional right to remain incarcerated in a particular prison or to be held in a specific security classification")).

The Supreme Court has held that "the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." *Wilkinson v. Austin*, 545 U.S. 209, 221–22 (2005) (citing *Meachum*, 427 U.S. at 225 (no liberty interest arising from Due Process Clause itself in transfer from low-to maximum-security prison because "[c]onfinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose")). "Changing an inmate's prison classification . . . ordinarily does not deprive him of liberty, because he is not entitled to a particular degree of liberty in prison." *Sawyer v. Jefferies*, 315 F. App'x 31, 34 (10th Cir. 2008) (citing *Templeman v. Gunter*, 16 F.3d 367, 369 (10th Cir. 1994) (citing *Meachum*, 427 U.S. at 225)).

Plaintiff does not have a constitutional right to dictate where she is housed, whether it is which facility or which classification within a facility. *See Schell v. Evans*, 550 F. App'x 553, 557 (10th Cir. 2013) (citing *Meachum*, 427 U.S. at 228–29; *Cardoso v. Calbone*, 490 F.3d 1194, 1197–98 (10th Cir. 2007)). Moreover, prison officials are entitled to great deference in the internal operation and administration of the facility. *See Bell v. Wolfish*, 441 U.S. 520, 547–48 (1979).

Plaintiff alleges that her assignment imposed atypical and significant hardship in relation to the ordinary incidents of prison life. Although Plaintiff is currently held in restrictive housing, she is allowed one and a half hours of out-of-cell time twice a day; she is allowed to run for one

hour each morning and to receive an adjusted shower schedule to accommodate her run; she is excepted from the requirement to be escorted with restraints; she has monthly in-person hearings before a Restrictive Housing Review Board; and she has remained in OSR status in restricted housing due to her behavior. *Cf. Wilkinson*, 545 U.S. at 223–24 (finding atypical and significant hardship in assignment to supermax facility where all human contact prohibited, conversation not permitted, lights on 24-hours-a-day, exercise allowed for only one hour per day in small indoor room, indefinite placement with annual review, and disqualification of otherwise eligible inmate for parole consideration). Plaintiff has not shown that her housing assignment subjects her to atypical and significant hardship in relation to the ordinary incidents of prison life. Plaintiff should show good cause why her due process claim should not be dismissed for failure to state a claim.

### B. Ex Post Facto

Plaintiff claims that managing her as a sex offender violates the Ex Post Facto Clause. In *Hill v. Simmons*, the Kansas Court of Appeals ("KCOA") found that IMPP 11-115[8] did not violate the Ex Post Facto Clause, as it "provides that an inmate may be managed as a sex offender while confined in prison and while on postrelease supervision, based on the inmate's conduct *while in prison*." *Hill v. Simmons*, 33 Kan. App. 2d 318, 321 (2004) (emphasis added).

The KCOA found that application of the IMPP is not retrospective in nature and does not increase the penalty the plaintiff is to serve, rather "[t]he policy is simply an administrative measure designed to enhance security of the facility and the rehabilitation of sex offenders." *Id*. IMPP 11-115A provides procedures for managing inmates as sex offenders, including

---

[8]  IMPP 11-115A defines a sex offender as including a resident "[w]hose sexual behavior during incarceration or while in the community following incarceration has been documented by a disciplinary conviction or revocation of post-incarceration supervision, and which then leads to the resident receiving an override to be managed as a sex offender."  Internal Management Policy & Procedure 11-115A, DECISION MAKING:  Sex Offender Program, Management and Supervision.

procedures for screening, due process hearings, and notification to inmates.  *See* IMPP 11-115A, DECISION MAKING:  Sex Offender Program, Management and Supervision.  Plaintiff should show good cause why her ex post facto claim should not be dismissed for failure to state a claim.

### C.  Disciplinary Report

Plaintiff seeks to have her disciplinary report expunged.  Section 1983 is not applicable to "challenges to punishments imposed as a result of prison disciplinary infractions," unless the disciplinary conviction has already been invalidated.  *Cardoso v. Calbone*, 490 F.3d 1194, 1199 (10th Cir. 2007).  The Supreme Court has made clear that "a state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if 'a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence,' unless the prisoner can demonstrate that the conviction or sentence has previously been invalidated."  *Edwards v. Balisok*, 520 U.S. 641, 643 (1997) (quoting *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)).  This rule applies not only when the prisoner challenges his conviction but also when he challenges punishments imposed as a result of prison disciplinary infractions.  *Balisok*, 520 U.S. at 648.

Challenges to prison disciplinary proceedings must be raised in a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2241.  *Abdulhaseeb v. Ward*, 173 F. App'x 658, 659 n.1 (10th Cir. 2006) (citing *McIntosh v. United States Parole Comm'n*, 115 F.3d 809, 811 (10th Cir. 1997) (petitions under § 2241 are used to attack the execution of a sentence, including the deprivation of good-time credits and other prison disciplinary matters); *Brown v. Smith*, 828 F.2d 1493, 1495 (10th Cir. 1987) ("If [the petitioner] can show that his due process rights were violated in the subject disciplinary proceedings, then § 2241 would be the appropriate remedy to use to restore his good time credits."); *see also Gamble v. Calbone*, 375 F.3d 1021 (10th Cir. 2004) (inmates were entitled to habeas relief on grounds that revocation of their earned credits

resulting from unsupported disciplinary convictions violated due process), *superseded by statute on other grounds as stated in Magar v. Parker*, 490 F.3d 816, 818–19 (10th Cir. 2007).  .

To the extent Plaintiff seeks to have her disciplinary record expunged, such a claim must be brought as a petition for habeas corpus under 28 U.S.C. § 2241.  *See Buhl v. Hood*, 81 F. App'x 273, 274 (10th Cir. 2003) (unpublished) (citing *see, e.g., Hamm v. Saffle,* 300 F.3d 1213, 1216 (10th Cir. 2002) (construing § 2254 habeas corpus action challenging prison disciplinary proceeding as action brought under § 2241); *Easter v. Saffle,* 51 Fed. Appx. 286, 288–89 (10th Cir. 2002) (noting that where claims necessarily imply invalidity of punishment imposed by disciplinary proceeding, they cannot be brought under § 1983) (unpublished); *Caserta v. Kaiser,* No. 00–6108, 2000 WL 1616248, at *2 (10th Cir. Oct. 30, 2000) (noting that determination of "issues concerning prison disciplinary proceedings," are properly brought under § 2241) (unpublished); *Blum v. Fed. Bureau of Prisons,* No. 98–1055, 1999 WL 638232, at *1 (10th Cir. Aug. 23, 1999) (recognizing federal prisoner's challenge to disciplinary proceeding brought under 28 U.S.C. § 2241) (unpublished); *Reed v. Smith,* No. 97–6341, 1999 WL 345492, at **1–2 (10th Cir. June 1, 1999) (challenge to federal prison disciplinary proceeding not cognizable in *Bivens* action, but rather belongs under habeas corpus) (unpublished); *Brown v. Smith,* 828 F.2d 1493, 1494–95 (10th Cir. 1987) (construing civil rights complaint as also invoking § 2241 jurisdiction where prisoner challenged disciplinary proceedings)).

### D.  Discrimination

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr*., 473 U.S. 432, 439 (1985) (citation omitted).  "An equal

protection claim may challenge legislation or the conduct of an individual." *Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021) (citation omitted). The claim "may be asserted with respect to a group or a 'class of one.'" *Id.* (citation omitted). "The former is more common and concerns a 'governmental classification[ ] that affect[s] some groups of citizens differently than others.'" *Id.* (citations omitted).

Plaintiff alleges that she is being discriminated against based on her transgender status. A plaintiff "who alleges [such] an equal protection violation has the burden of providing the existence of purposeful discrimination" casing an adverse effect. *Id.* (citations omitted). "Once a plaintiff shows discriminatory intent and an adverse effect, a court reviews the government action under the appropriate level of scrutiny." *Id.* (citation omitted).[9]

Plaintiff has failed to allege purposeful discrimination and has failed to state a plausible cause of action based on discrimination. Plaintiff claims that she is being discriminated against based on her transgender status. Because it was unclear how the determination was made to manage Plaintiff as a sex offender, or what procedures were followed, the Court ordered a *Martinez* Report. Based on the Report, the Court finds that Plaintiff has not stated a claim for discrimination based on her transgender status.

---

[9]  In this case, Plaintiff has not alleged that she is a member of a suspect class or that her claims involve a fundamental right. *See Durham v. Lappin*, 346 F. App'x 330, 333 (10th Cir. 2009) (unpublished) ("Prisoners are not suspect classes.") (citation omitted); *see Holt v. Patty*, 2017 WL 4338315, at 86 (D. Kan. 2017) ("Because neither prisoners nor indigents constitute a suspect class, the challenged policy need only bear a rational relationship to legitimate government ends.") (citation omitted); *see also Lee v. Poudre School Dist.*, 2023 WL 8780860, at *17 (D. Colo. Dec. 19, 2023) (finding that to date the Tenth Circuit has not decided whether transgender individuals are members of a quasi-suspect class, and therefore District Courts within the Tenth Circuit remain obligated to follow the Tenth Circuit's decision in *Brown* declining to find transgender status as a quasi-suspect class and applying a rational basis scrutiny) (citing *see, e.g.*, *Griffith v. El Paso Cnty.*, No. 21-cv-00387-CMA-NRN, 2023 WL 2242503, at *10 (D. Colo. Feb. 27, 2023), *report and recommendation adopted*, 2023 WL 3099625 (D. Colo. Mar. 27, 2023), *appeal docketed*, No. 23-1135 (10th Cir. Apr. 26, 2023); *Poe v. Drummond*, No. 4:23-cv-00177-JFH-SH, 2023 WL 6516449, at *7 (N.D. Okla. Oct. 5, 2023), *appeal docketed*, No. 23-5110 (10th Cir. Oct. 10, 2023); *Fowler v. Stitt*, 676 F. Supp. 3d 1094, 2023 WL 4010694, at *21 (N.D. Okla. 2023)).

Plaintiff argues that her receipt of a disciplinary report for hugging was discriminatory because other inmates are not cited for the same conduct.  However, the Report shows that other inmates were cited for the same offense.  Linda Hull-Viera, the UTM for the restrictive housing unit at TCF, states in her declaration that she has "filed eight disciplinary reports to other residents in restrictive housing for hugging since July of 2023, when [she] assumed the position of UTM."  (Doc. 21–5, at 3.)   Plaintiff was given several warnings prior to her charge and consistently refused to follow no-contact rules in place for all restrictive housing residents. Plaintiff was not the first or only resident to receive a disciplinary report for failing to maintain a no-contact environment in restrictive housing.  *Id*.  Plaintiff does not deny that the incident occurred and she pleaded guilty to the charge.

Plaintiff also argues that her OSR status and placement in restrictive housing is a form of discrimination.   The Report sets forth the justification for housing Plaintiff in OSR status. Plaintiff was identified as an Other Security Risk by Warden Gloria Giether. Plaintiff's unwillingness to answer questions about her violent crimes against women, uncertainty of how Plaintiff would interact with women after 50 years in male-only correctional facilities, and concerns for Plaintiff's safety were cited as justification. Plaintiff's MDT has consistently recommended maintaining Plaintiff's OSR status due to her inappropriate behavior towards others and her pattern of non-compliance with facility rules.

Plaintiff has failed to show that she was discriminated against based on her transgender status.  Plaintiff should show good cause why her discrimination claim should not be dismissed for failure to state a claim.

**IV.**  The Court will grant Plaintiff an opportunity to respond to the Report and to show good cause why this matter should not be dismissed for the reasons stated in this Memorandum and Order.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff shall have until **May 3, 2024,** in which to respond to the Report at Doc. 19 and to show good cause why this matter should not be dismissed for the reasons set forth in this Memorandum and Order.  Failure to respond by the deadline may result in dismissal of this action without further notice.

**IT IS SO ORDERED.**

**Dated April 3, 2024, in Kansas City, Kansas.**

<u>**S/  John W. Lungstrum**</u>
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**