IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MICHELLE RENEE LAMB,

      **Plaintiff,**

      v.                                      CASE NO. 23-3239-JWL

LAURA KELLY, et al.,

      **Defendants.**

## MEMORANDUM AND ORDER

Plaintiff brings this pro se civil rights action under 42 U.S.C. § 1983. Plaintiff, a transgender female, is incarcerated at the Topeka Correctional Facility in Topeka, Kansas ("TCF"). On December 12, 2023, the Court entered a Memorandum and Order (Doc. 13) ("M&O")[1], screening Plaintiff's Amended Complaint and finding that the proper processing of Plaintiff's claims could not be achieved without additional information from appropriate KDOC officials. *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978); *see also Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991). Accordingly, the Court ordered the Kansas Department of Corrections ("KDOC") officials to prepare and file a *Martinez* Report.

The Court also found that Plaintiff's claims against Governor Kelly and John and/or Jane Does 1–10 were subject to dismissal and ordered Plaintiff to show good cause why these claims should not be dismissed. Plaintiff responded, and on January 10, 2024, the Court entered a Memorandum and Order (Doc. 18) dismissing Plaintiff's claims against Governor Kelly and John and/or Jane Does 1–10. The Court also found that Plaintiff's claim seeking to have her

---

[1] *Lamb v. Kelly*, 2023 WL 8599374 (D. Kan. Dec. 12, 2023).

1

disciplinary record expunged must be brought as a petition for habeas corpus under 28 U.S.C. § 2241.

The *Martinez* Report (Doc. 19) (the "Report") was filed, and on April 3, 2024, the Court screened Plaintiff's Amended Complaint and entered a Memorandum and Order (Doc. 26) ("M&O II")[2] granting her an opportunity to respond to the Report and to show good cause why this matter should not be dismissed for the reasons set forth in the M&O II. Plaintiff filed a response (Docs. 27, 31) and a Motion to Produce (Doc. 30). Plaintiff has also filed a Motion for Permission to Start Discovery (Doc. 36) and a Motion to Unseal Dr. Amy Swan's Forensic Report (Doc. 37).

Plaintiff's allegations in her Amended Complaint are set forth in detail in the Court's M&O and M&O II. The findings in the Report are also set forth in detail in the M&O II. In summary, she claims that she is being kept in restricted housing based on an invalid disciplinary report and other unfounded and groundless allegations. Plaintiff claims that her housing assignment constitutes an atypical and significant hardship in violation of her due process rights. Plaintiff challenges her disciplinary report based on a "double hug," arguing that it should not be considered a lewd act. Plaintiff also claims that managing her as a sex offender, when she has not been convicted of a sex offense, constitutes an illegal ex post facto application of the Sex Offender Registration Act.

**A.  Motions**

Plaintiff's Motion to Produce seeks an order directing the KDOC to produce the Forensic Psychologist Report prepared by Amy Swann. (Doc. 30, at 1.) Plaintiff alleges that Swann's report will refute the assertions made in the *Martinez* Report. *Id*. On June 7, 2024, the Court

---

[2]  *Lamb v. Kelly*, 2024 WL 1434520 (D. Kan. April 3, 2024).

entered an Order (Doc. 32) granting the KDOC an opportunity to either supplement the Report with Swann's forensic report, or to respond to Plaintiff's motion indicating why the forensic report is not relevant or otherwise unavailable.

The KDOC filed a response (Doc. 33) indicating that the Forensic Report, authored by Amy Swann, was not "considered, referenced, or otherwise applied by KDOC officials in determining Plaintiff's conditions of confinement, namely her eventual placement in administrative restrictive housing." (Doc. 33, at 2.) "The purpose of Ms. Swann's Forensic Report was to determine if Ms. Lamb should be moved to the Topeka Correctional Facility after surgery; it was not intended to determine her housing assignment once she arrived there." *Id*. The KDOC's response also indicates that there was a contradicting report, and that it did not rely on either report. *Id*. at 3. The KDOC states that because "the Forensic Report was never factored into any aspect of Plaintiff's placement in administrative housing it is not relevant to Plaintiff's current case." *Id*. The Court denies the motion based on the KDOC's response and because the Court is dismissing this matter as set forth below.

Plaintiff has also filed a Motion for Permission to Start Discovery (Doc. 36), and a Motion to Unseal Dr. Amy Swan's Forensic Report (Doc. 37). Plaintiff seeks to start the discovery process and seeks to have the Forensic Report unsealed. This case did not pass screening and is being dismissed. Therefore, any request for discovery is denied. Furthermore, as stated above, the Forensic Report, as well as the contradictory report, were not used in determining Plaintiff's housing assignment. To the extent Plaintiff believes that the Forensic Report was submitted under seal, she is mistaken. The KDOC's response to the motion to produce was placed under seal at Doc. 33, because the response contains a discussion of multiple forensic evaluations of Plaintiff and allowing public access to the protected health information

may create safety and security risks for Plaintiff. The motion to produce the Forensic Report was denied and the Forensic Report is not part of the Court's record in this case. Plaintiff's motions are denied.

### B. Due Process

The Court found in the M&O that Plaintiff has not shown that her housing assignment subjects her to atypical and significant hardship in relation to the ordinary incidents of prison life. Plaintiff alleges that her placement in restrictive housing constitutes an atypical and significant hardship. Liberty interests which are protected by the Due Process Clause are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (internal citations omitted). Plaintiff does not have a constitutional right to a particular security classification or to be housed in a particular yard. *Meachum v. Fano*, 427 U.S. 215, 224 (1976); *Harbin-Bey v. Rutter*, 420 F.3d 571, 577 (6th Cir. 2005) (increase in security classification does not constitute an atypical and significant hardship because "a prisoner has no constitutional right to remain incarcerated in a particular prison or to be held in a specific security classification")).

The Supreme Court has held that "the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." *Wilkinson v. Austin*, 545 U.S. 209, 221–22 (2005) (citing *Meachum*, 427 U.S. at 225 (no liberty interest arising from Due Process Clause itself in transfer from low-to maximum-security prison because "[c]onfinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose")). "Changing an inmate's prison

classification . . . ordinarily does not deprive him of liberty, because he is not entitled to a particular degree of liberty in prison." *Sawyer v. Jefferies*, 315 F. App'x 31, 34 (10th Cir. 2008) (citing *Templeman v. Gunter*, 16 F.3d 367, 369 (10th Cir. 1994) (citing *Meachum*, 427 U.S. at 225)).

The Court found in the M&O that Plaintiff does not have a constitutional right to dictate where she is housed, whether it is which facility or which classification within a facility. *See Schell v. Evans*, 550 F. App'x 553, 557 (10th Cir. 2013) (citing *Meachum*, 427 U.S. at 228–29; *Cardoso v. Calbone*, 490 F.3d 1194, 1197–98 (10th Cir. 2007)). Moreover, prison officials are entitled to great deference in the internal operation and administration of the facility. *See Bell v. Wolfish*, 441 U.S. 520, 547–48 (1979).

Plaintiff alleges that her assignment imposed atypical and significant hardship in relation to the ordinary incidents of prison life. The Court ordered Plaintiff to show good cause why her due process claim should not be dismissed for failure to state a claim. In her response, Plaintiff argues that the Defendants did not deny Count I of her Amended Complaint alleging that her treatment and OSR status is "atypical" and a "significant hardship." (Doc. 27, at 2.) However, the Report was ordered to assist the Court in screening Plaintiff's Amended Complaint and was prepared by the KDOC, not the Defendants. The Defendants have not been required to answer or otherwise respond to the Amended Complaint. The M&O provided that "[i]f the Amended Complaint survives screening, the Court will enter a separate order setting an answer deadline." *Lamb v. Kelly*, 2023 WL 8599374, at *6 (D. Kan. 2023).

Plaintiff claims that denying her all physical contact with other females puts her at risk of suffering a heart attack or stroke. (Doc. 27, at 2) (citing Exhibit DR4); *see also id*. at 14. Plaintiff alleges that her OSR status is depriving her of human needs and is causing her severe

depression, stress, and anxiety. *Id*. at 4; *see also* Doc. 27–2. The Court finds that Plaintiff has failed to show that her housing assignment constitutes an atypical and significant hardship. As the Court found in the M&O II, although Plaintiff is currently held in restrictive housing, she is allowed one and a half hours of out-of-cell time twice a day; she is allowed to run for one hour each morning and to receive an adjusted shower schedule to accommodate her run; she is excepted from the requirement to be escorted with restraints; she has monthly in-person hearings before a Restrictive Housing Review Board; and she has remained in OSR status in restricted housing due to her behavior. *Cf. Wilkinson*, 545 U.S. at 223–24 (finding atypical and significant hardship in assignment to supermax facility where all human contact prohibited, conversation not permitted, lights on 24-hours-a-day, exercise allowed for only one hour per day in small indoor room, indefinite placement with annual review, and disqualification of otherwise eligible inmate for parole consideration). Plaintiff has not shown that her housing assignment subjects her to atypical and significant hardship in relation to the ordinary incidents of prison life.

In her response, Plaintiff sets forth various reasons why she believes she should not be held in restrictive housing, including Amy Swann's report stating that she is not a threat to any female at TCF, and letters written in 2016 recommending her for transfer to a female facility after she completes her transition to female. (Doc. 27, at 2) (citing Exhibits M1 and M2). Plaintiff also stresses that no female inmates have made a complaint against her even though she has been around them in classes, and while housed at the Larned State Hospital from 1985 to 1987. *Id*. at 5. However, the Report shows that Plaintiff's placement was based on her refusal to answer questions about her convictions during her RDU evaluation in February 2023 after she arrived at TCF in January 2023.

In her response, Plaintiff alleges that the Report provides self-serving statements "that

6

totally disregarded the truth and only served their own interest, made innuendos that suggest that [Plaintiff did] something immoral, improper, etc., without a single fact to support their erroneous, false allegations." *Id*. at 1.  Plaintiff takes issue with Defendants using the nature of her criminal offense and her refusal to complete her RDU evaluation as reasons for her OSR status. *Id*. at 4.  Plaintiff claims that the reference to the nature of her criminal offense is "an erroneous assumption without any supporting facts and is contrary to the facts in [her] prison record." *Id*.  Plaintiff also disputes the assertion in the Report that she engaged in inappropriate sexual behavior with one of her victims. *Id*. at 7.  She alleges there is "no proof of these false allegations." *Id*.

Plaintiff previously filed a case in this Court, prior to her reassignment surgery, seeking a transfer to a female facility.  This Court held in that case that:

> "Inmates do not have a constitutional right to choose their place of confinement."[3] And although Lamb argues that "transfer does not raise serious safety and security concerns," the Court cannot overlook the heinous crimes for which Lamb is serving three life sentences. Thomas Lamb murdered Karen Sue Kemmerly—a woman. Shortly thereafter, he kidnapped Patricia Ann Childs—another woman—and forced her to have sex with him while she was held against her will. Thomas was ordered to serve three life sentences so that he would never kill or hurt another woman again. Thomas is now Michelle, but Michelle is still a convicted kidnapper and murderer of women, and the justification for her sentence has not changed.
>
> "Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel.... Accordingly, we have held that even when an institutional restriction infringes on a specific constitutional guarantee, ... the practice must be evaluated in the light of the central objective of prison administration,

---

[3] *United States v. Neighbors*, 2012 WL 2449865, at *1 (D. Kan. 2012); *see also Cox v. Fluery*, 2009 WL 3011221, at *5 (W.D. Mich. 2009) ("A prisoner has no right under federal law to compel or prevent a transfer to another facility."); *Lamb v. Maschner*, 633 F. Supp. 351, 353 (D. Kan. 1986) ("Even though a transfer may relieve plaintiff's anxieties, clearly a violation of the women's rights would be at issue.").

>safeguarding institutional security."[4] KDOC has determined that the transfer of Michelle to a female facility would give rise to safety and security concerns. The Court has no reason to upset that determination.[5]

*Lamb v. Norwood*, 262 F. Supp. 3d 1151, 1160 (D. Kan. 2017), *aff'd* 899 F.3d 1159 (10th Cir. 2018), *cert. denied* 140 S. Ct. 252 (2019); *see also Lamb v. Rizzo*, 242 F. Supp. 2d 1032, 1038 (2003), *aff'd* 391 F.3d 1133 (10th Cir. 2004) (finding that Lamb had so destroyed his own public reputation that he was libel-proof and stating that "[t]he Kansas Supreme Court, in denying Lamb's appeal, narrated the evidence of the sexual assault against Childs and Lamb's continued violent attempts to flee justice") (citing *State v. Lamb,* 209 Kan. 453, 455–61, 497 P.2d 275, 279–82 (1972), *overruled in part, State v. Jacques,* 225 Kan. 38, 587 P.2d 861 (1978)).

Plaintiff has not shown that her housing assignment subjects her to atypical and significant hardship in relation to the ordinary incidents of prison life. Plaintiff has failed to show good cause why her due process claim should not be dismissed.

**C. Ex Post Facto**

Plaintiff claims that managing her as a sex offender violates the Ex Post Facto Clause. In the M&O, the Court cited *Hill v. Simmons*, where the Kansas Court of Appeals ("KCOA") found that IMPP 11-115[6] did not violate the Ex Post Facto Clause, as it "provides that an inmate may be managed as a sex offender while confined in prison and while on postrelease supervision,

---

[4] *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S. Ct. 1861, 60 L.Ed.2d 447 (1979).

[5] Had any of Lamb's claims survived summary judgment, the Court would note that Lamb's cause of action against KDOC would be barred by the Eleventh Amendment. KDOC is a state agency, and "[a]ctions commenced pursuant to 42 U.S.C. § 1983 cannot be brought against the State of Kansas or any state agencies since the state is not a person within the meaning of the Eleventh Amendment of the United States Constitution." *Lee v. McManus*, 589 F. Supp. 633, 638 (D. Kan. 1984); *see also Murray v. Kan. Dep't of Corrections*, 2009 WL 1617664, at *3 (D. Kan. 2009) ("[B]ecause KDOC is a state agency and state agencies are not subject to suit under 42 U.S.C. § 1983, the Court must dismiss Plaintiff's claims against KDOC brought pursuant to 42 U.S.C. § 1983.").

[6] IMPP 11-115A defines a sex offender as including a resident "[w]hose sexual behavior during incarceration or while in the community following incarceration has been documented by a disciplinary conviction or revocation of post-incarceration supervision, and which then leads to the resident receiving an override to be managed as a sex offender." Internal Management Policy & Procedure 11-115A, DECISION MAKING: Sex Offender Program, Management and Supervision.

...

based on the inmate's conduct *while in prison*." *Hill v. Simmons*, 33 Kan. App. 2d 318, 321 (2004) (emphasis added).

The KCOA found that application of the IMPP is not retrospective in nature and does not increase the penalty the plaintiff is to serve, rather "[t]he policy is simply an administrative measure designed to enhance security of the facility and the rehabilitation of sex offenders." *Id*. IMPP 11-115A provides procedures for managing inmates as sex offenders, including procedures for screening, due process hearings, and notification to inmates. *See* IMPP 11-115A, DECISION MAKING: Sex Offender Program, Management and Supervision.

The Court ordered Plaintiff to show good cause why her ex post facto claim should not be dismissed for failure to state a claim. In her response, Plaintiff disputes the finding that she engaged in inappropriate sexual behavior with one of her victims, arguing that "Defendants offered no proof of these false allegations." (Doc. 27, at 7.) As set forth above, the Court has issued opinions setting forth the nature of Plaintiff's criminal offenses.

Plaintiff then argues that she has "a liberty interest in not being registered as a sex offender" and cites the "Kansas Offender Act" as being punitive and argues it cannot be applied retroactively without violating ex post facto principles. *Id*. at 7–8. Plaintiff cites *Doe v. Thompson* as support for her argument. *Id*. at 8. That case found that the 2011 amendments to the Kansas Offender Registration Act ("KORA"), which extended the required registration period, were punitive and that applying them retroactively violated the Ex Post Facto Clause. *See Doe v. Thompson*, 304 Kan. 291, 373 P.3d 750, 760 (2016). On the same day the opinion in *Thompson* was issued, the opinion was overruled in *State v. Petersen-Beard*, where the Kansas Supreme Court found that "this court is persuaded that the holding of *Thompson* . . . that KORA constitutes punishment is incorrect . . . [and] are instead convinced by the dissent in *Thompson*

that a faithful application of federal precedents requires us to find that the provisions of KORA at issue here are not punitive for purposes of applying our federal Constitution." *State v Petersen-Beard*, 304 Kan. 192, 377 P.3d 1127, 1131 (2016) ("We therefore overrule the contrary holdings of *Thompson* . . ."). Plaintiff has failed to show good cause why her ex post facto claim should not be dismissed.

To the extent Plaintiff raises additional claims regarding her classification by the KDOC as a sex offender, those claims would be barred by the statute of limitations.[7] Plaintiff's sex offender override was approved on September 16, 2002. *See* Doc. 21–16 (September 16, 2002 letter from the sex offender override panel approving Plaintiff as a "sex offender" for KDOC purposes). Plaintiff filed a habeas corpus action in state court in 2004, as "one of several throughout the state, involving the KDOC identifying and classifying inmates as sex offenders when they were never actually convicted in a court of law of such offenses per KDOC policy IMPP 11–115 which allows such classification if 'the sexual motivation of the offense may be determined through either a judicial finding made at the time of sentencing *or by information regarding the offense provided to the Kansas Department of Corrections*.'" Doc. 21–18 (*Lamb v. Kansas*, Case No. 2004cv0132, April 30, 2009 Order Summarily Dismissing Petition for Writ of Habeas Corpus (District Court of Butler County, Kansas)). In summarily denying Plaintiff's state habeas action as untimely, the District Court of Butler County, Kansas, found that:

> In a previously unpublished opinion published pursuant to Supreme Court order, the Court of Appeals published a case on February 6, 2009, which this Court believes is determinative of the issues in *Lamb*. See *Jeffrey Litzinger v. L.E. Bruce*, Case No. 99,251, ___ Kan. App. 2d ___. In *Litzinger*, the same issue

---

[7] The statute of limitations applicable to § 1983 actions is determined from looking at the appropriate state statute of limitations and tolling principles. *See Hardin v. Straub*, 490 U.S. 536, 539 (1989). "The forum state's statute of limitations for personal injury actions governs civil rights claims under both 42 U.S.C. § 1981 and § 1983. . . . In Kansas, that is the two-year statute of limitations in Kan. Stat. Ann. § 60–513(a)." *Brown v. Unified Sch. Dist. 501, Topeka Pub. Sch.*, 465 F.3d 1184, 1188 (10th Cir. 2006) (citations omitted).

>  arose. The facts in *Litzinger* are instructive. Litzinger had been charged in district court with various drug crimes and rapes. He was convicted on the drug charges, but the rape charges were dismissed. Litzinger was sentenced to prison. In December 2004, KDOC approved a request to have Litzinger managed as a sex offender. Litzinger requested an override. The override was denied by the override panel in February 2005.
>
>  On July 20, 2006, Litzinger filed a grievance with KDOC that was denied at all levels, with the final denial coming from the Secretary of Corrections on August 16, 2006. Litzinger then filed a court action pursuant to KSA 60-1501 on November 6, 2006. The District Court dismissed his case finding that Litzinger's cause of action arose in December 2005 or February 2006 when Litzinger became aware of KDOC's classification decision. The district court found that KAR 44-15-101b required that Litzinger file a grievance within 15 days from the date he discovered the event giving rise to the subject matter of the grievance and concluded that even if Litzinger were allowed to revive his claim by using the August 16, 2006 grievance denial as the triggering date, his suit was, nevertheless untimely. The Kansas Court of Appeals affirmed the dismissal of Litzinger's 60-1501, finding that KDOC's classification decision commenced the running of the 30-day period for Litzinger to appeal, and his attempt to toll the statute by his untimely pursuit of the grievance process did not toll the statute. Thus the dismissal was proper.

*Id*. In denying Plaintiff's action as untimely, the Butler County District Court found that Plaintiff was classified as a sex offender in September 2002, his request for override was subsequently denied, on January 10, 2003, Plaintiff was advised by counsel that the grievance/60-1501 process would be appropriate to get the matter to the District Court, and Plaintiff did not file the state action until 2004 and did not start the grievance process until February 2005. *Id*. Any claims brought in this § 1983 action would also be untimely.

**D. Disciplinary Report**

In her response, Plaintiff continues to argue that her disciplinary conviction was based on an illegal interpretation of the word "lewd," and that a hug should not be considered a lewd act. (Doc. 27, at 9.) Plaintiff also states that she has received two additional disciplinary reports for

hugging other residents that are on appeal, and a third disciplinary report was dismissed. *Id*. Plaintiff claims that Defendants have failed to deny her claims in Count III. *Id*. As set forth above, Defendants did not prepare the Report and have not been ordered to answer or otherwise respond to the Amended Complaint.

The Court previously found that Plaintiff cannot challenge her disciplinary proceedings in this civil rights action. Challenges to prison disciplinary proceedings must be raised in a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2241. *Abdulhaseeb v. Ward*, 173 F. App'x 658, 659 n.1 (10th Cir. 2006) (citing *McIntosh v. United States Parole Comm'n*, 115 F.3d 809, 811 (10th Cir. 1997) (petitions under § 2241 are used to attack the execution of a sentence, including the deprivation of good-time credits and other prison disciplinary matters); *Brown v. Smith*, 828 F.2d 1493, 1495 (10th Cir. 1987) ("If [the petitioner] can show that his due process rights were violated in the subject disciplinary proceedings, then § 2241 would be the appropriate remedy to use to restore his good time credits.").

Section 1983 is not applicable to "challenges to punishments imposed as a result of prison disciplinary infractions," unless the disciplinary conviction has already been invalidated. *Cardoso v. Calbone*, 490 F.3d 1194, 1199 (10th Cir. 2007). The Supreme Court has made clear that "a state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if 'a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence,' unless the prisoner can demonstrate that the conviction or sentence has previously been invalidated." *Edwards v. Balisok*, 520 U.S. 641, 643 (1997) (quoting *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)). This rule applies not only when the prisoner challenges his conviction but also when he challenges punishments imposed as a result of prison disciplinary infractions. *Balisok*, 520 U.S. at 648.

**E. Discrimination**

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citation omitted). "An equal protection claim may challenge legislation or the conduct of an individual." *Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021) (citation omitted). The claim "may be asserted with respect to a group or a 'class of one.'" *Id*. (citation omitted). "The former is more common and concerns a 'governmental classification[ ] that affect[s] some groups of citizens differently than others.'" *Id*. (citations omitted).

Plaintiff alleges that she is being discriminated against based on her transgender status. A plaintiff "who alleges [such] an equal protection violation has the burden of providing the existence of purposeful discrimination" causing an adverse effect. *Id*. (citations omitted). "Once a plaintiff shows discriminatory intent and an adverse effect, a court reviews the government action under the appropriate level of scrutiny." *Id*. (citation omitted).[8]

Plaintiff has failed to allege purposeful discrimination and has failed to state a plausible cause of action based on discrimination. Plaintiff claims that she is being discriminated against

---

[8] In this case, Plaintiff has not alleged that she is a member of a suspect class or that her claims involve a fundamental right. *See Durham v. Lappin*, 346 F. App'x 330, 333 (10th Cir. 2009) (unpublished) ("Prisoners are not suspect classes.") (citation omitted); *see Holt v. Patty*, 2017 WL 4338315, at 86 (D. Kan. 2017) ("Because neither prisoners nor indigents constitute a suspect class, the challenged policy need only bear a rational relationship to legitimate government ends.") (citation omitted); *see also Lee v. Poudre School Dist.*, 2023 WL 8780860, at *17 (D. Colo. Dec. 19, 2023) (finding that to date the Tenth Circuit has not decided whether transgender individuals are members of a quasi-suspect class, and therefore District Courts within the Tenth Circuit remain obligated to follow the Tenth Circuit's decision in *Brown* declining to find transgender status as a quasi-suspect class and applying a rational basis scrutiny) (citing *see, e.g.*, *Griffith v. El Paso Cnty.*, No. 21-cv-00387-CMA-NRN, 2023 WL 2242503, at *10 (D. Colo. Feb. 27, 2023), *report and recommendation adopted*, 2023 WL 3099625 (D. Colo. Mar. 27, 2023), *appeal docketed*, No. 23-1135 (10th Cir. Apr. 26, 2023); *Poe v. Drummond*, No. 4:23-cv-00177-JFH-SH, 2023 WL 6516449, at *7 (N.D. Okla. Oct. 5, 2023), *appeal docketed*, No. 23-5110 (10th Cir. Oct. 10, 2023); *Fowler v. Stitt*, 676 F. Supp. 3d 1094, 2023 WL 4010694, at *21 (N.D. Okla. 2023)).

based on her transgender status. Because it was unclear how the determination was made to manage Plaintiff as a sex offender, or what procedures were followed, the Court ordered a *Martinez* Report. Based on the Report, the Court finds that Plaintiff has not stated a claim for discrimination based on her transgender status.

Plaintiff argues that her receipt of a disciplinary report for hugging was discriminatory because other inmates are not cited for the same conduct. However, the Report shows that other inmates were cited for the same offense. Linda Hull-Viera, the UTM for the restrictive housing unit at TCF, states in her declaration that she has "filed eight disciplinary reports to other residents in restrictive housing for hugging since July of 2023, when [she] assumed the position of UTM." (Doc. 21–5, at 3.) Plaintiff was given several warnings prior to her charge and consistently refused to follow no-contact rules in place for all restrictive housing residents. Plaintiff was not the first or only resident to receive a disciplinary report for failing to maintain a no-contact environment in restrictive housing. *Id*. Plaintiff does not deny that the incident occurred and she pleaded guilty to the charge.

Plaintiff also argues that her OSR status and placement in restrictive housing is a form of discrimination. The Report sets forth the justification for housing Plaintiff in OSR status. Plaintiff was identified as an Other Security Risk by Warden Gloria Giether. Plaintiff's unwillingness to answer questions about her violent crimes against women, uncertainty of how Plaintiff would interact with women after 50 years in male-only correctional facilities, and concerns for Plaintiff's safety were cited as justification. Plaintiff's MDT has consistently recommended maintaining Plaintiff's OSR status due to her inappropriate behavior towards others and her pattern of non-compliance with facility rules. Plaintiff has failed to show that she was discriminated against based on her transgender status.

Plaintiff has failed to show good cause why her claims should not be dismissed for failure to state a claim.

**IT IS THEREFORE ORDERED BY THE COURT** that this matter is **dismissed** for failure to state a claim.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Produce (Doc. 30), Motion for Permission to Start Discovery (Doc. 36), and a Motion to Unseal Dr. Amy Swan's Forensic Report (Doc. 37) are **denied.**

**IT IS SO ORDERED.**

**Dated July 8, 2024, in Kansas City, Kansas.**

                                               **S/ John W. Lungstrum**
                                               **JOHN W. LUNGSTRUM**
                                               **UNITED STATES DISTRICT JUDGE**